STATE OF MONTANA, PLAINTIFF AND RESPONDENT, *v.* JOHN B. DIETZ, DEFENDANT AND APPELLANT.

No. 9953.

Submitted January 19, 1959. Decided August 4, 1959.

343 Pac. (2d) 539.

MR. JUSTICES ADAIR and BOTTOMLY, dissented.

Leo J. Kottas, Helena, argued orally for appellant.

Forrest H. Anderson, Atty. Gen., Helena, Robert J. Emmons, Asst. Atty. Gen., for respondent. Robert J. Emmons, Asst. Atty. Gen., argued orally:

MR. JUSTICE ANGSTMAN:

Defendant was accused of the infamous crime against nature alleged to have been committed on or about the 8th day of November 1957. The crime was alleged to have been committed by forcibly inserting his penis into the mouth of a nine year old boy.

The jury found defendant guilty of an attempt to commit the crime charged in the information.

He was sentenced to serve a term of fifteen and one-half years in the state prison at Deer Lodge. His motion for a new trial was denied and he has appealed from the judgment and from the order denying his motion for a new trial.

Here the record shows, as pointed out in the dissenting opinion written by MR. JUSTICE ADAIR, that the jury found defendant guilty of an attempt to commit the crime charged, whereas the judgment recites that defendant was convicted of the infamous crime against nature. This recitation in the judgment was evidently an inadvertence.

Counsel for defendant does not predicate any error on the part of the court in the respect above noted. The point was not raised in the trial court and probably for a good

reason. Had it been called to the attention of the trial judge he doubtless would have corrected the judgment. It is axiomatic that the court has the power to correct its judgment so that it speaks the truth. Power & Bro., Ltd. v. Turner, 37 Mont. 521, 97 Pac. 950. The point is not pressed upon us for we would no doubt do what other courts have done, viz., remand the case for the correction of the judgment in this respect. People ex rel. Weed v. Whipp, 352 Ill. 525, 186 N.E. 135; LaGore v. Ramsey, Mo. 1939, 126 S.W. (2d) 1153; McWilliams v. Walker, 209 Iowa 769, 229 N.W. 183; People v. Brown, 312 Ill. 63, 143 N.E. 440.

Defendant would then find himself in exactly the same situation in which he now is. The amount of the punishment is well within the limits of the law for one guilty of an attempt to commit the infamous crime against nature coupled with a prior conviction of which defendant pleaded guilty. The punishment for the infamous crime against nature is not less than five years. The maximum could be any number of years. The punishment for an attempt is one-half of the longest term for the offense attempted. R.C.M. 1947, section 94-4711. That could have been fifteen and one-half years or more without reference to the prior conviction, and where there is a prior conviction the punishment cannot be less than ten years. R.C.M. 1947, section 94-4713.

With these considerations in mind it is not strange that able counsel for defendant did not raise this point either in the trial court or here. In the dissenting opinion, reference is made to the case of State v. Shambo, 133 Mont. 305, 322 Pac. (2d) 657, as sustaining the contention that the judgment here cannot stand. That case does not touch upon the point here involved. The jury's verdict here was and is sustained by the evidence. By it, defendant was found guilty of an attempt to commit the infamous crime against nature. The judgment, reciting as it does that defendant was convicted of the infamous crime against nature, is erroneous. It is subject to correction by the trial court, but to do so does not require

the granting of a new trial, nor is it ground for releasing and discharging defendant. Had defendant sought correction of the judgment either in the trial court or here, no doubt he would have been granted that right.

The prosecution was based upon section 94-4118, R.C.M. 1947, reading:

"Every person who is guilty of the infamous crime against nature, committed with mankind or with any animal, is punishable by imprisonment in the state prison not less than five years."

The appeal presents for consideration but one legal question, and that is, may the crime denounced by section 94-4118, supra, be committed when the act complained of is alleged to have been committed by penetration of the mouth rather than of the anus. The point was raised by several assignments of error. Counsel for defendant contends that section 94-4118 can only be violated by penetration of the anus as that was the method recognized by the common law in defining sodomy.

There are many cases supporting defendant's contention. Among them may be cited People vs. Boyle, 116 Cal. 658, 48 Pac. 800; Prindle v. State, 31 Tex. Cr. R. 551, 21 S.W. 360, 37 Am. St. Rep. 833; State v. Johnson, 44 Utah 18, 137 Pac. 632; Davis v. Brown, 27 Ohio St. 326; Estes v. Carter, 10 Iowa 400; State v. McGruder, 125 Iowa 741, 101 N.W. 646; Ausman v. Veal, 10 Ind. 355, 71 Am. Dec. 331; Kinnan v. State, 86 Neb. 234, 125 N.W. 594, 27 L.R.A., N.S., 478.

It should be noted that many of the states where this rule was thus declared have since amended the statute so as to make it sodomy when there is penetration of the mouth.

There are also many cases, under statutes identical or similar to ours, which take the view that the statute is violated when there is penetration of the mouth. Among them may be cited State v. Start, 65 Or. 178, 132 Pac. 512, 46 L.R.A., N.S., 266; State v. Maida, 29 Del. 40, 96 A. 207; Commonwealth v. Poindexter, 133 Ky. 720, 118 S.W. 943; State v. Altwatter, 29

Idaho 107, 157 Pac. 256; Ex parte Benites, 37 Nev. 145, 140 Pac. 436; Ephriam v. State, 82 Fla. 93, 89 So. 344; State v. Griffin, 175 N.C. 767, 94 S.E. 678; Fisher v. State, 197 Tenn. 594, 277 S.W. (2d) 340; State v. Davis, 223 Miss. 862, 79 So. (2d) 452; Ex parte De Ford, 14 Okl. Cr. 133, 168 Pac. 58; Territory v. Wilson, 26 Haw. 360; State v. Cyr, 135 Me. 513, 198 A. 743.

With decisions both ways on the subject, this court in State v. Guerin, 51 Mont. 250, 152 Pac. 747, rejected the rule contended for by defendant's counsel herein and held specifically that the crime may be committed *per os*. That decision settled the question in this state. It has stood for forty-three years. The rule of *stare decisis* should control.

If the doctrine of *stare decisis* means anything it should apply here. Of that doctrine, Mr. Justice Adair in his dissenting opinion in Guardian Life Ins. Co. of America v. State Board of Equalization, 134 Mont. 526, 335 Pac. (2d) 310, 334, stated:

"*Stare decisis*. The Constitution of Montana and the laws enacted by the Legislature in conformity thereto will continue as the law of this jurisdiction only when the time-honored dictrine of *stare decisis* is observed and followed in this and the other courts of our state.

"*Stare decisis* is a Latin phrase. It is the principle that the decisions of this court should stand as precedents for future guidance. It means to stand by decided cases; to uphold precedents; to maintain former adjudications. In law, it means that when the highest appellate court of the jurisdiction has once laid down a principle applicable to a particular given state of facts, it will adhere to that principle and apply it to all future cases, irrespective of whether the parties and property are the same.

"Under this principle, a deliberate decision of a court, made after argument on a question of law fairly raised in the case, and necessary to its decision, is an authority of binding precedent in the same court and likewise in other courts of equal

or lower rank in subsequent cases where that particular point is again in controversy.

"It is not necessary that we be concerned with how good or how bad the first pronouncement of the highest appellate court of the state might be in construing and interpreting the Constitution of our state or the enactments of our state Legislative Assembly so long as that construction holds and is adhered to until such time as the people see fit to change the Constitution and the Legislature sees fit to change the laws enacted by it under the constitutional method applicable thereto. The highest appellate court of the state should stand by its decided cases and rely upon the people and the Legislature to take care of any modifications deemed necessary to the law by reason of any decisions of the Supreme Court construing or interpreting the provisions of either the Constitution or statutes of the state."

The majority opinion in the Guardian Life Insurance case, supra, did not take issue with the dissenting opinion so far as it defined the doctrine of *stare decisis*. The court divided on the question as to what was decided by the case against Mr. Justice Adair sought to apply the doctrine.

This case is not comparable to that of State ex rel. Morgan v. State Board of Examiners, 131 Mont. 188, 309 Pac. (2d) 336, 340, quoted from in the dissenting opinion, wherein we followed the rule previously announced that "previous decisions should not be followed to the extent that error may be perpetuated."

In that case we expressly overruled a former one (Bryant v. Board of Examiners, 130 Mont. 512, 305 Pac. (2d) 340) which had stood for less than three months. There were several reasons for so doing, as pointed out in the opinion; none of which apply here. In the first place it was by a divided court. It was not acquiesced in for a period of time, as is true in the Guerin case, now approaching forty-four years, but only for three months. It affected important public official

502

action, and in such cases courts are more free to re-examine legal questions.

· Likewise this case differs from that of State ex rel. James v. Aronson, 132 Mont. 120, 314 Pac. (2d) 849, in that there was no acquiescence in the case of State ex rel. Mitchell v. Holmes, 128 Mont. 275, 274 Pac. (2d) 611, which was over-ruled by the Aronson case.

The Legislature, at the first opportunity, passed a new act ▇ omitting some of the provisions condemned by this court in the Mitchell case, and in no sense acquiesced in it. It too was by a divided court and this court will more readily re-examine a legal question under such circumstances than in a case of a unanimous decision.

In addition to what was so well stated by MR. JUSTICE ▇ ADAIR as to what is meant by *stare decisis*, we might add that the doctrine should be applied to all questions of law which were considered and determined even though some of the justices may admit that they can write a better opinion the other way. The doctrine should be applied to the case of State v. Guerin, supra, which, as above noted, has stood for forty-three years without any change by the legislative assembly. Applying the rule of *stare decisis* to the Guerin case, the judgment appealed from here must be and is affirmed.

MR. JUSTICE CASTLES, and THE HONORABLE PHILIP C. DUNCAN, District Judge, sitting in place of MR. CHIEF JUSTICE HARRISON, concur.

MR. JUSTICE ADAIR:

I dissent.

By amended information filed January 17, 1958, the county attorney of Lewis and Clark County, Montana, charged that on November 8, 1957, in that county the defendant, John Benjamin Dietz, "being a person over the age of eighteen years, did wilfully, unlawfully * * * and feloniously * * * then and there commit *the infamous crime against nature*

upon the person and body of [a named boy of the age of nine years] by then and there forcibly inserting the penis * * * into the mouth of'' the boy named. The information charged that theretofore the defendant had suffered conviction in the State of New York of *an attempt* to there commit an entirely unrelated felony.

The defendant Dietz pleaded not guilty to the charge of having committed *the infamous crime against nature.*

At the outset of his trial, the defendant's court appointed counsel, Leo J. Kottas, Esq., made timely objection to the introduction of any evidence in the case upon the grounds: That the amended information, under which defendant was being tried, fails to charge *the infamous crime against nature* as defined by law; that the Montana statute (R.C.M. 1947, section 94-4118) under which the defendant was charged and accused is indefinite, vague and uncertain (See State v. Lutey Bros., 55 Mont. 545, at page 553, 179 Pac. 457, at page 458; H. Earl Clack Co. v. Public Service Comm., 94 Mont. 488, at pages 502, 503, 22 Pac. (2d) 1056, at pages 1059, 1060); that a definition or description of the act or acts constituting the alleged crime charged nowhere appears in any of the statutes as enacted by the legislative department of the State of Montana; and that the interpretation and construction of the statute (formerly section 8359 of the Revised Codes of Montana of 1907 but now R.C.M. 1947, section 94-4118) as pronounced by the Supreme Court of Montana in its decision in State v. Guerin, 51 Mont. 250, 152 Pac. 747, constitutes a usurpation by the judicial department of the State of Montana of the legislative authority and power of the state which is vested solely in the Legislative Assembly and, by express provision of the Constitution, denied to the judicial department of the State of Montana. See Constitution of Montana, Art. IV, section 1, Art. V, sections 1-45, Art. VIII, sections 1-10, and Art. XX, section 1; R.C.M. 1947, sections 12-101, 12-102, 12-103, 12-104, 93-401-5 and 93-401-16.

In denying defendant's objection to the introduction of any

evidence herein, the trial judge observed: "I am denying your motion. On the authority of 51 Montana 250 [152 Pac. 747]. It was under the authority of that case that this Information was permitted to be filed and in full recognition of the point involved the motion is denied and the objection is overruled. Exception will be noted."

In his attempt to prove the charges set forth in the amended information, the county attorney introduced the testimony of seven witnesses and then rested. Not only did the testimony of these seven witnesses fail to prove the essential element of penetration but the testimony of the prosecuting witness, being the boy named in the information, affirmatively establishes the fact that there was no penetration in this case. On this and other specified grounds, defendant's counsel interposed a timely motion for a nonsuit, which motion the trial court denied. Thereupon the defendant took the witness stand,—gave testimony in his own behalf wherein he directly and unconditionally denied the charges so made against him and then rested his case without calling any other witness or introducing any other evidence.

The jury, after hearing the court's instructions, and completing its deliberations, declined to convict the defendant of having committed *the infamous crime against nature* and returned into court with its verdict which, omitting the title of the court and cause, reads as follows:

"Verdict

"We, the jury in the above-entitled cause, find the defendant guilty of *an attempt* to commit the crime charged in the information, and leave his punishment to be fixed by the Court.

"Dated this 10th day of February, 1958.

"Henry T. Harrison
"Foreman"

Emphasis supplied.

Thereupon, on February 10, 1958, the trial judge made, signed and filed in the district court a judgment which, omitting the title of the court and cause, is in words and figures as follows:

"Judgment and Commitment to State Penitentiary, Plea of Not Guilty.

 "Filed February 10, 1958
"Present Hon. Victor H. Fall, Judge
"The State of Montana
 against
"John Benjamin Dietz

*"Convicted of infamous crime against nature.*

"The County Attorney, with the Defendant John Benjamin Dietz and his Counsel, Leo J. Kottas came into Court. The Defendant was duly informed by the Court of the nature of the information filed against him, of his arraignment and plea of 'Not Guilty' as charged in said information, of said trial and the verdict of the jury on the 10th day of February, A.D., 1958, *'Guilty of the crime of infamous crime against nature a felony committed on or about the 8th day of November, A.D., 1957, in the County of Lewis and Clark, State of Montana as charged in the information.'* The defendant was then asked if he had any legal cause to show why judgment should not then be pronounced against him to which he replied that he had none. And no sufficient cause being shown or appearing to the Court, thereupon the Court renders its judgment: *That whereas the said John Benjamin Dietz was duly convicted in this Court of the crime of infamous crime against nature* a felony, committed in the County of Lewis and Clark, State of Montana, on or about the 8th day of November, A.D., 1958;

"Now, Therefore, It Is Ordered, Adjudged And Decreed, and this does order, adjudge and decree, *that the said defendant is guilty of the offense charged in the information herein that is, of the crime of infamous crime against nature,* a felony, which said offense was committed in the County of Lewis and Clark, State of Montana, on or about the 8th day of November, A.D., 1957; and that he be punished by confinement in the State Prison in Powell County, State of Montana, at hard labor, for the term of fifteen and one-half years (15½).

"It Is Further Ordered, Adjudged And Decreed that the defendant is guilty of a prior conviction as charged in the amended information, and to which prior conviction the defendant in open court entered a plea of 'guilty' thereto.

"The defendant is remanded to the custody of the sheriff of Lewis and Clark County, State of Montana, who will deliver said defendant into the custody of the Warden of the State Prison who will see that this judgment is carried into execution.

"Victor H. Fall

"Judge

"Duly Verified"

Emphasis supplied.

At its very outset the judgment bears the false and misleading phrase: "Convicted of infamous crime against nature." Then each and all of the succeeding italicized portions of the judgment and commitment are clearly erroneous,—contrary to the proven facts,—contrary to the law and contrary to the jury's verdict herein.

By its verdict the jury found the defendant "guilty of *an attempt* to commit the crime charged in the information." It did not find him *"guilty of the crime of infamous crime against nature"* as is recited in the judgment.

The defendant was not *"duly convicted * * * of the crime of infamous crime against nature"* as is recited in the judgment and commitment.

The jury's verdict did not and it does not authorize or empower the trial court to adjudge or decree *"that the said defendant is guilty of the offense charged in the information herein; that is, of the crime of infamous crime against nature"* as is recited in the judgment and commitment.

The state's proof affirmatively shows that the defendant did not commit the crime charged in the information. It is one thing to find a prisoner, standing before the bar of justice, guilty of *an attempt* to kill a human being, but it is quite

another thing to find such prisoner guilty of the actual felonious killing and murder of a human being.

Here the jury's verdict only found "the defendant guilty of *an attempt* to commit the crime charged." Obviously such verdict did not warrant the making and rendering of the judgment entered herein. Such judgment is clearly contrary to the verdict. It is contrary to both the evidence and the law. It cannot stand. It must be reversed, vacated and set aside. Compare State v. Shambo, 133 Mont. 305, 322 Pac. (2d) 657.

The particular crime of which the county attorney attempted to charge the defendant is that known to the common law of England by the five-word phrase, "the infamous crime against nature." See 4 Blackstone's Commentaries at page 215.

The Montana statute, under which the amended information was filed, upon which the defendant was tried, and upon which the state relies to sustain the judgment of conviction in this case, is section 94-4118 of the Revised Codes of Montana of 1947, which reads:

"94-4118. (11030) *Crime against nature.* Every person who is guilty of the infamous crime against nature, committed with mankind or with any animal, is punishable by imprisonment in the state prison not less than five years."

The information charges that the alleged offense was committed with mankind, namely, with a boy, hence, on this particular appeal, the court is not concerned with that portion of section 94-4118, supra, having application to acts of sexual intercourse committed by either a man or a woman "with any animal" meaning, with any animal or brute beast other than of the *genus Homo sapiens* which latter offense is more specifically and properly known as *bestiality.*

The word "bestiality' is defined in Ballentine's Law Dictionary, 2d ed., at page 148, as "The crime of unnatural sexual relations between man and beast.", and in 1 Bouv. Law Dict., Rawle's Third Revision, at page 339, as "A sexual connection between a human being and a brute of the opposite sex."

In the above-quoted statute, section 94-4118, supra, the Montana Legislature has used the definite article *"the"* in the five-word phrase, *"the* infamous crime against nature" employed by it in designating *the* crime punishable under section 94-4118. It did not use either of the indefinite articles "a" or "an."

The definite article *"the"* in the quoted five-word phrase particularizes the noun; that is, it specifies and particularizes a particular thing separate and distinct from others of the same class or groups so that in employing the definite article *"the"* in the phrase *"the* infamous crime against nature" the Montana Legislature has specified and designated *the* particular crime there made punishable, separate and distinct from the numerous other crimes which, solely because of the character of the punishment provided therefor, are termed and classified generally is infamous crimes.

As was said in Koontz v. People, 82 Colo. 589, 263 Pac. 19, 21:

"The statute does not say, 'one of the crimes against nature,' or 'a crime against nature,' or 'any crime against nature,' but *'the* infamous crime against nature.' * * * At common law, 'the infamous crime against nature' was sodomy. 4 Blackstone, Comm, page 215; * * * At common law, sodomy, * * * was committed only by penetration *per annum*; penetration *per os* did not constitute the crime."

The trial judge gave the jury twenty-three separately numbered instructions wherein he assumed to state the *law* of this jurisdiction applicable to the instant case.

In the first sentence of his second instruction the trial judge stated: "It becomes my duty as judge to instruct you concerning *the law* applicable to this case, and it is your duty as jurors to follow *the law* as I shall state it to you."

Next, over defendant's separate and timely objections thereto, the trial judge, in his instructions Nos. 3 and 4, instructed the jury as follows:

"Instruction No. 3. Infamous crime against nature, as ap-

plied to the facts in this case, consists of the penetration of the mouth of one person by the sexual organ of a male person.''

''Instruction No. 4. If you believe from the evidence in this case, beyond a reasonable doubt, that at the time and place alleged in the information, the defendant penetrated the mouth of [the boy named in the information] with his sexual organ, then you must find the defendant guilty.''

There is no Act of the Montana Legislature and no Act of the English Parliament, dating from the time of the Enactment of the statute of 25, Henry VIII, Chapter 6, in the year 1533 A.D. down to January 11, 1865, when the Territory of Montana adopted the common law of England as ''the law and rule of decision'' in this jurisdiction (when ''not in conflict with the special Enactments of this Territory''), that warrants or justifies the giving of the trial court's Instructions Nos. 3 and 4, supra. Both instructions are contrary to and against the common law of England and the statutes of Montana. Both are highly prejudicial and the giving of them over defendant's timely and proper objections constitutes prejudicial error requiring the reversal of the judgment of conviction herein.

In England, prior to the year 1533 A.D., the particular vice, since made a crime and now punishable under section 94-4118, supra, was under the exclusive jurisdiction of the ecclesiastical censures.

*1533 A.D.* In the year 1533 A.D., the Parliament in England, enacted the statute of 25 Henry VIII, Chapter 6, entitled ''The Punishment of the Vice of Buggery'' which made ''the detestable and abominable Vice of Buggery committed with Mankind or Beast'' a felony, without benefit of clergy, at common law and provided the punishment therefor.

The statute of 25 Henry VIII, Chapter 6, supra, was repealed by 1 Edward VI, Chapter 2, but was subsequently (1562) reenacted by 5 Elizabeth, Chapter 17. See Bishop's New Criminal Law, II, section 1196.

*1552-1634 A. D.* Sir Edward Coke (commonly called Lord

Coke), a brilliant and learned English lawyer and jurist, born in 1552, died in 1634, and in 1613 appointed Chief Justice of the King's Bench in England, made and kept notes on all the cases he heard and, commencing in the year 1628, he published "The Institutes of the Laws of England" in the third part whereof at page 58 he wrote:

"CAP X.

"Of Buggery, or Sodomy.

"If any person shall commit buggery with mankind, or beast; by authority of parliament this offense is adjudged felony without benefit of clergy. But it is to be known, (that I may observe it once for all) that the statute of 25 H. 8, was repealed by the statute of 1 Mar. whereby all offenses made felony or premunire by any act of parliament made since 1 H. 8 were generally repealed, but 25 H. 8 is revived by 5 Eliz.

"Buggery is a detestable, and abominable sin, amongst christians not to be named, committed by carnall knowledge against the ordinance of the Creator, and order of nature, by mankind with mankind, or with brute beast, or by womankind with brute beast.

"*Bugeria* is an Italian word, and signifies so much, as is before described, *paederastes* or *paiderestes* is a Greek word, *amator puerorum,* which is but a species of buggery, and it was complained of in parliament, that the Lumbards had brought into the realm the shameful sin of sodomy, that is not to be named, as there it is said. Our ancient authors doe conclude, that it deserveth death, *ultimum supplicium,* though they differ in the manner of the punishment. * * *

"The act of 25 H. 8, hath adjudged it felony, and therefore the judgment for felony doth now belong to this offence, viz. to be hanged by the neck till he be dead."

Thus did the human behavior or act designated as "buggery" by the common law of England in Coke's day (1552-1634) signify the same human behavior and act as did the Greek words *paederastes* or *paedicatio* or *paedico* or *paideres-*

*tes* or *paideristia* or *paiderastia,* or *pedicattio* or *paedicattio* or *pedico,* or some of the other and additional words that the Greeks had and used to name and designate the practice known as *paiderastia* or *pedicatio.* Some of these Greek words, of which there were some 74, were derived from the Greek word *pais* meaning "boy" while others were derived from the Greek *pedex* or *podex* meaning anus. *Pedicatio* (or *paedicatio*) is the most generally accepted term for the sodomitical intromission of the penis into the anus.

The ancient theological and legal term "sodomy" (sodomia) has become attached to the physical act of intercourse *per anum,* even when carried out heterosexually. The term sodomy is said to have had its origin in the story of Lot's visitors with whom the men of Sodom desired to have intercourse and the subsequent destruction of the cities of Sodom and Gomorrah. See Genesis, Chapter XIX.

In Coke's day in England, (1552-1634) the terms "sodomy" and "buggery" came to have identical meaning. "Bugger" (in French *bougre*) is a corruption of "Bulgar," the ancient Bulgarian heretics having been popularly supposed to have indulged in such behavior and practice. It would appear that the people of every country have always been quite eager to associate sexual deviation with some country other than their own. However at no time has the Montana Legislative Assembly ever enacted any statute wherein either the word *"sodomy"* or the word *"buggery"* was used.

Further, in "The Institutes of the Laws of England," Third Part, Cap. X, at pages 58 and 59, Lord Coke wrote:

"The act of 25 H. 8, hath adjudged it felony · * * * to be hanged by the neck till he be dead. He that readeth the preamble of this act, shall find how necessary the reading of our ancient authors is: the statute doth take away the benefit of clergy from the delinquent. But now let us peruse the words of the said description of buggery.

*"Detestable and abominable.*] Those just attributes are found in the act of 25 H. 8.

*"Amongst Christians not to be named.*] These words are in the usual indictment of this offence, and are in effect in the parliament roll of 50 E. 3, *ubi supra,* nu. 58.

*"By carnal knowledge, etc.*] The words of the indictment be, *contra ordinationem creatoris, et naturae ordinem, rem habuit veneream, dictumque, puerem carnaliter cognovit,* etc. So as there must be *penetratio,* that is, *res in re,* either with mankind, or with beast, but the least penetration maketh it carnall knowledge. See the indictment of Stafford, which was drawn by great advice for committing buggery with a boy, for which he was attainted and hanged.

"The sodomites came to this abomination by four means, viz. by pride, excesse of diet, idlenesse, and contempt of the poor. *Otiosus nihil cogitat, nisi de ventre et venere.* Both the agent and consentient are felons : and this is consonant to the law of God. *Qui dormierit cum masculo coitu faemineo, uterque operatus est nefas, et morte moriatur.* And this accordeth with the ancient rule of law, *agentes et consentientes pari paena plectentur.*

*"Emissio seminis* maketh it not buggery, but is an evidence in case of buggery of penetration : and so in rape the words be also, *carnaliter cognovit,* and therefore there must be penetration; and *emissio seminis* without penetration maketh no rape. *Vide* in the chapter of Rape. \* \* \*

*"Or by woman.*] This is within the purvien of this act of 25 H. 8. For the words be, if any person, etc., which extend as well to a woman, as to a man, and therefore if she commit buggery with a beast, she is a person that commits buggery with a beast, to which end this word [person] was used. And the rather, for that somewhat before the making of this act, a great lady had committed buggery with a baboon, and conceived by it, etc."

*1723-1780 A.D.* Sir William Blackstone, the most famous of English jurists, born in 1723, died in 1780, in his celebrated *"Commentaries on The Laws of England"* in four volumes published in the years 1765-1769, comments on the crime punish-

able under the common law of England and designated as "the infamous crime against nature, committed either with man or beast." See 4 Blackstone's Commentaries at page 215. In 1770 Blackstone was made a Justice of Common Pleas which office he held at the time of his death in the year 1780.

In America, both before and after the Declaration of Independence, the lawyers and judges, first of the colonies and later of the United States, read and studied Blackstone's *Commentaries* which became the chief, and in many cases, the only source of knowledge of the common law of England here available and which had a great and lasting influence on the legislation and jurisprudence in the United States. It was from this source that the lawyers, lawmakers and other "disciples of Blackstone" adopted and wrote into the statutes of the various states and territories the five-word phrase, "the infamous crime against nature" which, in the western part of the United States appeared first in the statutes of California (1850) and then later, by adoption from California, in the statutes of the Territory of Montana (1865).

*1817 A.D.* In the year 1817, in England, one Samuel Jacobs was tried and convicted upon an indictment charging him with the common-law crime of sodomy, alleged to have been committed on a boy about seven years old, *per os,* that is, by means of the mouth. To commit the common-law crime of sodomy by man with man or woman, the copulation must be *per anum.* Sodomy is not committed, at common law, *per os,* hence, on Jacobs' appeal from the judgment of conviction entered against him, the appellate court held, "that this [meaning the act *per os*] did not constitute the offence of sodomy" and directed a pardon to be applied for. See Rex v. Samuel Jacobs, 1 Russell & Ryan Cr. Cas. 332, 168 English Reports-Full Reprint at page 830. The reason why this conclusion was reached was that sodomy, being *the* crime for which Jacobs was indicted, tried and convicted, is not committed at common law *per os.*

*1849.* On December 15, 1849, the First Session of the Cali-

fornia Legislature convened at the City of Puebla de San Jose and it ended there on April 22, 1850.

Prior to April 13, 1850, the civil law prevailed in California.

*1850. The Rule of Decision in California.* On April 13, 1850, said California Legislature passed Chapter 95, page 219, of the Statutes of California of 1850, entitled "An Act adopting the Common Law," which Act provides:

"The Common Law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United States, or the Constitution or laws of the State of California, *shall be the rule of decision in all the Courts of this State."* Emphasis supplied.

On April 16, 1850, being but three days subsequent to the enactment of Chapter 95, supra, said California Legislature passed Chapter 99, pages 229-247, of the Statutes of California of 1850, entitled "An Act concerning Crimes and Punishments," section 48, in the Fifth Division, whereof, at page 234 reads:

"Section 48. The infamous crime against nature, either with man or beast, shall subject the offender to be punished by imprisonment in the State Prison for a term not less than five years, and which may extend to life."

*1864-1865. The Rule of Decision in Montana.* On May 26, 1864, Montana Territory was formed. Thereafter, the First Legislative Assembly of the Territory of Montana, convened at Bannack, passed an Act entitled "An Act adopting the common law of England" which Act was approved January 11, 1865, and provides:

"Sec. 1. That the common law of England, so far as the same is applicable and of a general nature, and not in conflict with special enactments of this Territory, *shall be the law and the rule of decision,* and shall be considered as of full force until repealed by legislative authority.

"Sec. 2. This act shall be in force from and after its passage." Emphasis supplied. See Laws of Montana Territory, 1st Session 1864 (Bannack Statutes) at page 356.

This statute has been reenacted a number of times, amended

once but never repealed and is now section 12-103, R.C.M. 1947, and continued in force and effect as the law of this state by section 1 of Article XX of the Constitution of Montana.

Thus the common law of England, as it was up to and including January 11, 1865, has been a part of our system of jurisprudence in Montana at all times since January 11, 1865, and "is the rule of decision in all the courts of this state" when "not repugnant to or inconsistent with the constitution of the United States, or the constitution or laws of this state, or of the codes." R.C.M. 1947, section 12-103. Also see R.C.M. 1947, section 12-104; State ex rel. Cornwell v. District Court, 122 Mont. 266, 273, 200 Pac. (2d) 706; Smith Engineering Co. v. Rice, 9 Cir., 102 F. (2d) 492, 497, certiorari denied Rice v. Smith Engineering Co., 307 U.S. 637, 59 S. Ct. 1034, 83 L. Ed. 1519, rehearing denied 308 U.S. 632, 60 S. Ct. 68, 84 L. Ed. 527, and cases there cited.

The First Session of the First Legislative Assembly of the Territory of Montana, (1864-1865) also passed an Act entitled "An Act concerning Crimes and Punishments" section 44 of Chapter IV, Laws of Montana Territory, 1st Session, 1864 at page 185, which provides:

"Sec. 44. The infamous crime against nature, either with man or beast, shall subject the offender to be punished by imprisonment in the *Territorial* prison for a term not less than five years, and which may extend to life." Emphasis supplied.

Except for the word "Territorial" appearing in the Montana statute, section 44, supra, in the place of the word "State" used in the California statute of April 16, 1850, it is quite apparent that the later Montana statute (1864-1865) was taken and adopted, word for word, and comma for comma, from the earlier (1850) California statute, section 48 of Chapter 99, and that the common law phrase "the infamous crime against nature" appearing in each statute refers to and contemplates precisely the same behavior or act, irrespective of whether indulged in California, in Montana, or in England.

What was the common law of England as to the behavior

or act that constitutes "the infamous crime against nature" on January 11, 1865, the effective date of the Montana statute, now R.C.M. 1947, section 12-103, adopting the common law as "the rule of decision in all courts of this state?"

The answer to such question is:

The common law of England as it was up to January 11, 1865, was and is as pronounced, and written some 48 years before in the case of Rex v. Jacobs, supra, decided in England in 1817, which apparently is the only reported English case wherein the question of whether the infamous crime against nature or sodomy is committed, at common law, *per os*. On Jacobs' appeal it was the opinion of the judges of the appellate court that the act perpetrated in the mouth did not constitute the crime of sodomy charged in the indictment, hence the appellate court directed that a pardon be applied for. At common law, from the year 1533 A.D. down to January 11, 1865, prosecutions for sodomy committed by mankind with human beings had been confined and restricted to cases where the copulation has been effected *per annum*.

The common law is as stated by Dr. Wm. L. Burdick in Vol. 3, "The Law of Crime," at pages 293-297, viz.:

"The word 'sodomy' is derived from Sodom, the ancient city reported to have been destroyed by fire and brimstone in punishment for its unspeakable vices. In the Mosaic law, persons guilty of the abominations of that city were called 'Sodomites,' and were punished with death. * * *

"Sodomy is also known as 'the unnatural crime,' 'the infamous crime against nature,' and 'buggery.' The term includes the unnatural connection of man with woman, 'contrary to nature,' that is *per anum;* also of man with man in a similar way, and man with a young boy, this latter form of sodomy being known as pederasty. Sodomy, as the term is generally used, also includes bestiality, that is, carnal copulation of either man or woman with a beast. Some medical writers confine sodomy to unnatural intercourse with human beings,

this distinguishing it from bestiality, but this distinction is not made by the common law. * * *

"At common law, sodomy is defined as either the sexual copulation, *per anum,* of a man with another man or with a woman; or the copulation of a man or woman with a brute animal. The essential elements of the crime may, therefore, be particularized as follows: (1) copulation *per anum;* (2) by man with man or woman; or (1) copulation; (2) by man or woman; (3) with a beast.

"In sodomy committed by man with man, or man with woman, the unnatural copulation must be, according to the common law, a rectal *coitus (per anum).* Sodomy is not committed at common law, *per os,* that is, by means of the mouth * * *

"In bestiality the carnal copulation is committed either by a man or by a woman with a beast, that is, with one of the lower animals of the opposite sex. * * *

"Sodomy is an infamous crime, and was made a felony by an early English statute, the offense having, previously, been under the jurisdiction of the ecclesiastical courts. The English statute is old enough to be a part of our own common law."

The English case of Rex v. Jacobs, 1 Russell & Ryan C.C. 331, 168 English Reports Full Reprint 830, decided in England in 1817 A.D., definitely holds that penetration *per os* does not constitute sodomy under the law of England.

Numerous text writers have long recognized that under the common law of England "the infamous crime against nature" is not committed by the use of the mouth.

Wharton's Criminal Law (10th ed.), section 579, reads:

"Sodomy consists of sexual connection with any brute animal, or in sexual connection, *per anum,* by a man, with any man or woman.—The act committed in a child's mouth is not enough."

Bishop's New Criminal Law, Vol. II, section 1194, reads:

"A penetration of the mouth is not sodomy."

518

Bacon's Abridgement, Vol. 9, on page 160, where sodomy is discussed, reads:

"To constitute this offense the act must be in that part where sodomy is usually committed."

McClain on Criminal Law, Vol. 2, section 1153, reads:

"The act must be in that part where sodomy is usually committed; the act in a child's mouth does not constitute the offense."

Clark's Criminal Law on page 193 reads:

"The act in a person's mouth is not enough. It must be per anum."

Russell on Crimes (9th ed.), Vol. 1, page 937, reads:

"To constitute this offense, the act must be in that part where sodomy is usually committed. The act in a child's mouth does not constitute the offense."

Various law dictionaries recognize that "the infamous crime against nature" committed by man with another human being must be by rectal coitus and not by penetration of the mouth.

3 Bouv. Law Dict., Rawle's Third Revision, at page 3088, defines "sodomy" thus:

"Sodomy. A carnal copulation by human beings with each other against nature, or with a beast. See 2 Bish. Cr. Law, section 1191; Whart. Cr. Law 579. * * * *Penetration of the mouth is not sodomy;* Russ & R. 331; Prindle v. State, 31 Tex. Cr. R. 551, 21 S.W. 360, 37 Am. St. Rep. 833." Emphasis supplied.

Stroud's Judicial Dictionary, 2d ed. Vol. 3 at pages 1898 and 1899, reads:

"Sodomy.—'Every one commits the felony, called Sodomy who (a) carnally knows any animal; or (b) being a male, carnally knows any man or any woman (per anum)' (Steph. Cr. 114). Vf, Arch. Cr. 879-881; Rosc. Cr. 828: 1 Encyc, 27: Cowel, *Buggery:* Infamous Crime."

The writers of the medical dictionaries recognize that to constitute the infamous crime against nature by man with mankind the penetration must be *per anus* and not otherwise.

Blakiston's New Gould Medical Dictionary, page 945, says: "sodomy [*Sodom*]. 1. Sexual intercourse *by the anus,* usually considered as between males. 2. Bestiality. *q. v.*" Emphasis supplied.

The American Illustrated Medical Dictionary, by Dorland 21st ed. says: "sodomy (sod' o-me) [after the city of Sodom]. Copulation between males *by the anus.*" Emphasis supplied.

Psychiatric Word Book, by Hutchings, 9th ed. says: "sodomy (sod'-o-me). *Anal coitus* or pedication between men. In popular usage, the term is often misapplied to other forms of perversion." Emphasis supplied.

"Pedication (ped-i-ka'shun). *Anal coitus.* The word 'pederasty' is often used mistakenly where pedication is meant." Emphasis supplied.

"Fellatio (fel-la'she-o). The act of taking a penis into the mouth for the purpose of causing an orgasm. Some careful writers prefer the form fellation. Cf. Irrumation."

"Irrumation (ir-um-a'shun). The act of placing the penis in a person's mouth. Cf. Fellatio."

*"Thou shalt not lie with Mankind as with Womankind."*

In 48 Am. Jur., Sodomy, section 1, at pages 549 and 550, it is said:

"Originally * * * the crime of sodomy included only connection between two human beings of the male sex, the crime of unnatural sexual relations between man and beast being termed 'bestiality.' While there are statutes in every jurisdiction punishing the crime of sodomy, most of them fail to define with any degree of certainty the manner in which the crime against nature may be committed. Therefore, the rule applies that when a public offense has been declared by statute in the general terms of the common law, without more particular definition, and punishment provided therefor, the courts will resort to the common law for the particular acts constituting the offense. * * *

"The crime of sodomy derives its name from the City of Sodom, where the practice was prevalent, and *it would seem*

*from the prohibition in the Bible that the penetration was required to be per anum,* the prohibition being that *'thou shall not lie with mankind as with womankind'* (Lev. XVIII. 22). In England it was held at an early date that the penetration by a man of a human being per os was not sodomy." Emphasis supplied. Also see: Lev. XX. 13; Deut. XXIII. 17; Rom. I. 27; I. Cor. VI. 9; I. Tim. 1:10; Gen. XIX. 1-35; I. Kings XIV. 24.

While the First Legislative Assembly of the Territory of Montana (1864-1865) at page 185 of the Bannack Statutes, adopted the earlier California statute passed April 16, 1850, prescribing the punishment for a person convicted of having committed "*the* infamous crime against nature" yet the California Legislature thereafter amended such original statute which amended statute became section 286 of the West's Ann. Cal. Penal Code, and thereafter, in 1895, the Montana Legislature amended the original Montana statute of 1865 to read precisely as does the amended California Statute (West's Ann. Cal. Pen. Code, Sec. 286). The Montana statute so amended became section 496 of the Montana Penal Code of 1895, which statute later became section 8359, Revised Codes of 1907, now being section 94-4118, Vol. 8, Revised Codes of Montana of 1947, page 268.

In 1895, the Montana Legislature also adopted, verbatim, section 287 of the West's Ann. California Penal Code, supra, as section 497 of the Montana Penal Code of 1895, which became section 8360, Revised Codes of 1907, and now is section 94-4119, Vol. 8, Revised Codes of Montana of 1947, at page 269, the effect whereof was to no longer consider emission as an element of the offense of sodomy and to thus obviate the necessity of proving emission.

In Territory v. Stears, 1875, 2 Mont. 324, at page 330, it is said: "Our statute is a re-enactment of that of California, and the construction put upon it by the California courts might be said to be enacted with the statute. But other States,

with statutes springing from the same source, furnish precedents of like authority.''

In Hershfield & Bro. v. Aiken, 1880, 3 Mont. 442, at page 449, it is said: ''Our habit is to follow the decisions of the supreme court of California when applicable, having taken our Code from that State.''

In Nelson v. Great Northern Railway Co., 1903, 28 Mont. 297, at page 322, 72 Pac. 642, at page 650, it is said:

''It is a fundamental principle and universal rule that where a statute is taken from another state it is taken subject to the interpretation placed upon it by the courts of that state, and in principle it is difficult to understand why the same doctrine should not apply when a portion of the common law is enacted as a part of the statute. In Baker v. Baker, 13 Cal. 87, it was held that 'a statute in affirmance of the common law is to be construed as was the rule by that law'.'' To like effect see: State Savings Bank v. Albertson, 1909, 39 Mont. 414, 422, 102 Pac. 692, and State ex rel. Dolenty v. District Court, 1910, 42 Mont. 170, 173, 111 Pac. 731.

*1914. Guerin's Case in the District Court.* On July 27, 1914, the county attorney of Lewis and Clark County, Montana, filed in the district court of that county, an information charging that one C. F. Guerin, on February 18, 1914, at said county, ''did then and there commit in and upon the person of said John Doe the infamous crime against nature by wilfully, unlawfully and feloniously, taking in his the said C. F. Guerin's mouth, the private parts of the said Joe Doe, he, the said Guerin, then and there being a male human being, contrary to the form, force and effect of the statute, in such case made and provided and against the peace and dignity of the State of Montana.''

On July 28, 1914, the defendant Guerin appeared in the action by his counsel, Wellington D. Rankin, Esq., of Helena, who interposed a general demurrer challenging the sufficiency of the information to charge the commission of *''the infamous crime against nature''* made punishable, but not defined, by-

the provisions of section 8359, Revised Codes of Montana of 1907, now R.C.M. 1947, section 94-4118.

On August 4, 1914, the demurrer was orally argued before the Honorable J. M. Clements, district judge presiding, by Attorney Rankin for the defendant Guerin, and by the County Attorney for the State. The demurrer presented to the district court this single question of law, viz.:

Under the law of Montana can "the infamous crime against nature" be committed by man with mankind by penetration of the mouth?

Since Montana has no statute and no provision in its Constitution that either defines the offense known at common law as "*the* infamous crime against nature" or that specifies, names or describes the particular act, conduct, behavior or practice that constitutes such crime when committed by man with mankind, resort must be had to the common law of England for the law and rule of decision that here governs.

The term "common law of England" refers to that general system of law which prevails in England as distinguished from the Roman or civil law system.

There is no national common law operative as such throughout the states of the Union. The adoption of the common law was a matter left to the several states for their separate determination.

The common law of England has been part of Montana's system of jurisprudence from January 11, 1895, the date of its adoption by the First Territorial Legislature, to the present day.

Ours is a government of *law* and not of men.

Our Legislature has enacted in *the law* of this state the definition of "law" and declared how *the law* is expressed and pointed out its source.

Volume 1, Revised Codes of Montana of 1907, at page 1043, provides:

"3550. (Section 5150.) *Definition of law.*—Law is a solemn expression of the will of the supreme power of the state.

"3551. (Section 5151.) *How expressed.*—The will of the supreme power is expressed:

"1. By the constitution.

"2. By statutes.

"3552. (Section 5152.) *Common law, when rule of decision.—The common law of England,* so far as it is not repugnant to or inconsistent with the constitution of the United States, or the constitution or laws of this state, or of the codes, *is the rule of decision in all the courts of this state."* Emphasis supplied.

Sections 3550, 3551 and 3552, supra, are now sections 12-101, 12-102 and 12-103, R.C.M. 1947.

On June 15, A.D. 1215, the Magna Charta was granted in England. Therein it is written:

"Section 39. No freeman shall be taken or imprisoned * * or any ways destroyed, *nor will we pass upon him * * * unless by the lawful judgment of his peers, or by the law of the land.*

"Section 40. To none will we * * * deny, or delay, right or justice.

\* \* \* \* \* \*

"Section 45. We will not make any justices * * * but of such as *know the law of the realm* and *mean duly to observe it."* Emphasis supplied.

It became and was the duty of the district judge to ascertain and *know the law of the realm* and then *duly to observe* and apply it.

Here the common law of England, of which the English appellate court's decision, made in the year 1817 A.D., in Rex v. Jacobs, supra, is a part, is in no wise repugnant to or inconsistent with the Constitution of the United States, or the Constitution or laws of this state or of the codes, hence, under the plain provisions and legislative mandate set forth in section 3552, Rev. Codes 1907, supra, such decision becomes and "is the rule of decision in all the courts of this state" and such rule of decision was to be observed and applied in determining

the question of law presented by Guerin's demurrer to the information filed against him.

On August 11, 1914, Judge Clements, observing and applying such statutory rule of decision, sustained Guerin's demurrer to the information and rendered a judgment dismissing the prosecution. Thus, in effect, did the district court rule and conclude that under the common law of England, as it existed and was of force in the year 1865, when adopted by the First Territorial Legislature *as the rule of decision in all the courts* of this jurisdiction, "the infamous crime against nature" of which Guerin was accused was not consummated *per os,* i.e., by means of the mouth. The leading case of Rex v. Samuel Jacobs, supra, so ruled.

*1915. Guerin's Case in the Supreme Court.* From the district court's order sustaining Guerin's demurrer to the demurrer to the information and from the judgment of dismissal entered in the trial court, the State took an appeal to the Supreme Court. Again, the question presented was:

Under the law of Montana, may "the infamous crime against nature" be committed by man with mankind by penetration of the mouth?

Again, section 3552, Revised Codes of Montana of 1907, says: "The common law of England * * * is the rule of decision in all the courts of this state." Again the leading case of Rex v. Jacobs, supra, answered the question presented by its ruling "that this did not constitute the offence of sodomy."

In answer to the State's brief on its appeal in Guerin's case, Attorney Rankin filed in the Supreme Court, on behalf of his client Guerin, a most carefully prepared, thorough and accurate printed brief which fairly bristles with decisions and authorities fully sustaining Judge Clements' ruling order and judgment in the trial court. Mr. Rankin's brief was and is unanswerable. It cites the case of Rex v. Jacobs, supra, and it correctly states the common law of England of force on, and prior to January 11, 1865, when it was first adopted as "the rule of decision in all the courts" of this jurisdiction. Section

3552, Rev. Codes of Mont. of 1907, now R.C.M. 1947, section 12-103. See also Laws of Montana Territory, 1st Session 1864, (Bannack Statutes) at page 356.

In the early case of People v. Williams, 59 Cal. 397, the Supreme Court of California said:

"Every person of ordinary intelligence understands what the crime against nature with a human being is." Compare State v. Chandonette, 10 Mont. 280, 25 Pac. 438.

District Judge Clements was an intelligent, experienced and learned trial judge, exceptionally well versed in the *law of the realm* and disposed to duly observe and apply it in deciding Guerin's case.

In its opinion on the appeal in State v. Guerin, 51 Mont. 250, at pages 252, 253, 152 Pac. 747, at page 748, the Supreme Court conceded that Judge Clements' rulings and judgment were and are sustained by numerous authorities. The opinion recites:

"The learned district judge was of the opinion that such an act is not within the meaning of the statute. [Sections 3552 and 8359, Rev. Codes of 1907] * * * The conclusion of the district judge is, we must confess, in accord with the views of textwriters and courts which assume that, since the statute embodies the common-law definition of the crime of sodomy (4 Blackstone, 215), it denounces as crimes only those acts which were punishable as such in England, and, inasmuch as the crime at common law could be consummated with mankind only by penetration through the *anus,* the act charged here is not a violation of the statute. This view is founded upon the case of Rex. v. Jacobs, Russ. & R.C.C. 331.''

In its opinion determining the State's appeal in Guerin's case, the supreme court, 51 Mont. at page 253, 152 Pac. at page 748, referring to the decision in Rex v. Jacobs, supra, remarked:

"The case does not give any information as to why this conclusion was reached. On the other hand, the rule was, we *apprehend,* as stated by Hawkins in chapter IV, Book I, of his Pleas of the Crown, as follows: 'All unnatural carnal

copulation, whether with man or beast, *seem* to come under the notion of sodomy, which was felony by the ancient common law'."

Where in the common law of England does Hawkins *seem* to find the authority that *seems* to support his above-quoted statement first published in the year 1716 A.D.? On what court decision, statute or other source did Hawkins rely to authorize or support his above statement?

That Hawkins was by no means infallible is shown in Herring v. State, 119 Ga. 709, 46 S.E. 876, at pages 879, 880, wherein the court said:

"The contention of the able counsel for the plaintiff in error seems justified by what is laid down in Hawkins' Pleas of the Crown (vol. 1, page 433, section 7) * * * This work was a well-known text-book at the time our first Penal Code was adopted, and it is likely that the above-quoted statement of the law was in the minds of the judges who expressed similar opinions when dealing with certain civil cases. But in Curwood's edition of that work, in a footnote to the paragraph mentioned, *cases are cited which show that the author mistook the law.*" Emphasis supplied.

The Herring case, supra, is one of the five cases cited and relied upon by the three justices of this court to sustain their holding and opinion in State v. Guerin, 51 Mont. at page 255, 152 Pac. at page 749, wherein they said: "To our minds, the reasoning of these cases is conclusive."

Hawkins' use of the verb *"seem"* in the above-quoted sentence bespeaks uncertainty.

Funk & Wagnall's New Standard Dictionary defines such verb thus: "seem. To appear to the senses or the mind, or in imagination; present a semblance or an appearance; create, or give the impression of being; appear; look; as the bridge *seems* safe; the man *seems* honest: * * * 2. To appear to oneself; have the idea or opinion respecting oneself: a kind of reflective use; as I *seem* to hear strange voices."

Likewise, this court's use of the verb *"apprehend"* in its

opinion in Guerin's case, 51 Mont. at page 253, 152 Pac. at page 748, bespeaks uncertainty and conjecture.

Funk & Wagnall's New Standard Dictionary says: "*apprehend.* I. 1. To lay hold of with the mind; * * * 2. To have a mental impression of; know partially; hold opinions concerning; imagine; as, *to apprehend* an abstruse subject: opposed to *comprehend.* 3. To look forward to; anticipate with distrust or suspicion; as to *apprehend* disaster; to *apprehend* a hard winter. * * * II. 1. To think or suppose anything to be or to be so; opine; surmise; conjecture; as, the truth, I *apprehend* lies, in quite another direction."

In Barton v. State, 79 Ga. App. 380, 53 S.E. (2d) 707, at pages 710, 711, the court said: "Even the most casual examination of Hawkins' citations reveals that in making the statement Hawkins was using sodomy as a generic term and meant that what was otherwise known at common law as buggery and bestiality came within the definition of sodomy, the terms being synonymous at that time. *We do not think that he meant in sodomy proper any species of copulation between man and man or man and woman, other than per anum, was to be defined sodomy.* In Wharton's Criminal Law, Vol. 1 (12th Ed. 1932) section 754, page 1034, we find this statement, similar in import to what we have just said: 'Sodomy is the "crime against nature," or the "infamous crime against nature," these phrases being synonymous with the word "sodomy" in all its various branches or designations, and is a generic term which embraces (1) sodomy proper (2) buggery, and (3) bestiality.' It seems that the text writers are agreed that sodomy at common law was committed per anum and not otherwise. 2 Russell, Crimes, page 698; 2 Bishop New Crim. Law, section 1193; 25 Am. & Eng. Enc. Law, 2nd Ed., page 1145; McClain, Crim. Law, section 1153; Wharton, Crim. Law 579; Wharton, Crim. Law, 12th Ed., pages 1034-1047; Burdick, Law of Crime, Vol. 3, sections 876-880; Rex v. Jacobs, 168 Eng. Rep. (Full Reprint) 830.

"In the United States where the common-law crime of

sodomy has been prohibited or the statute enacted contemplated the common-law crime, *the courts have uniformly,* with one or two exceptions, *refused to take unto themselves the legislative function of expanding the definition,* leaving that function to repose within the proper power of the legislatures, where we assume it belongs. See Commonwealth v. Poindexter, 133 Ky. 720, 118 S.W. 943; Prindle v. State, 31 Tex. Cr. R. 551, 21 S.W. 360, 37 Am. St. Rep. 833; Mitchell v. State, 49 Tex. Cr. R. 535, 95 S.W. 500; Harvey v. State, 55 Tex. Cr. R. 199, 115 S.W. 1193; Lewis v. State, 36 Tex. Cr. R. 37, 35 S.W. 372, 61 Am. St. Rep. 831; Davis v. Brown, 27 Ohio St. 326 *(definition was expanded* following this decision by statute); Ausman v. Veal, 10 Ind. 355, 71 Am. Dec. 331; Estes v. Carter, 10 Iowa 400 *(definition was expanded* following this decision by statute); Kinnan v. State, 86 Neb. 234, 125 N.W. 594, 27 L.R.A., N.S., 478, 21 Ann. Cas. 335; People v. Boyle, 116 Cal. 658, 48 Pac. 800; People v. Schmitt, 275 Mich. 575, 267 N.W. 741, 742; State v. Johnson, 44 Utah 18, 137 Pac. 632; Wise v. Commonwealth, 135 Va. 757, 115 S.E. 508.

"In those states where it might appear that the courts of their own motion *expanded the definition,* it will be found, upon an examination of the cases, that it was not the court which changed the common law definition, but the change in the definition of sodomy was made by the statutes. See Honselman v. People, 168 Ill. 172, 174, 48 N.E. 304; Glover v. State, 179 Ind. 459, 101 N.E. 629, 45 L.R.A. N.S., 473; State v. Whitmarsh, 26 S.D. 426, 128 N.W. 580; State v. Gage, 139 Iowa 401, 116 N.W. 596; State v. Vicknair, 52 La. Ann. 1921, 28 So. 273; State v. Hubbard, Mo. Sup. 295 S.W. 788; State v. Nelson, 36 N.D. 564, 163 N.W. 278; State v. Cyr, 135 Me. 513, 198 A. 743. * * *

"* * * *'Content is given to many enactments of specific crimes only by resort to common law definitions,'* Common Law Crimes in the United States, 47 Columbia Law Rev. 1332, and 'we [must] go to the common law to get the meaning of the words used.' White v. State, 51 Ga. 285, 286; and see also

Levinson v. United States, 6 Cir., 47 F. (2d) 470(1). '*Where the common-law crime has been adopted, and common-law terms used in its definition, the construction previously placed thereon by the English courts becomes by intendment a part of the adopting statute.*' Thrower v. State, 117 Ga. 753, 757, 45 S.E. 126, 127.'' Emphasis supplied.

The volume entitled ''British Crown Cases'' edited by William Oldnall Russell and Edward Ryan, Barristers at Law of Lincoln's Inn, in England, contains the decisions upon the Crown cases reserved for consideration and decided by The Twelve Judges of England from the year 1799 to the year 1824. At page 331 of the volume appears the decision of The Twelve Judges of England on the appeal in the case of Rex v. Jacobs, supra. That decision, in its entirety, reads:

''Rex v. Samuel Jacobs.

''The prisoner forced open a child's mouth and put in his private parts, and proceeded to a completion of his lust. Held, that this did not constitute the offence of sodomy.

''The prisoner was tried and convicted before the Lord Chief Baron Richards, at the Warwick Lent assizes, in the [*332] year 1817, upon an indictment for sodomy, committed on James Thompson (a boy of about seven years of age,) on the 8th of March, 1817.

''It was proved very satisfactorily, that the prisoner had prevailed upon the child to go with him from the market place in Nun-Eaton to a rick yard in a field near the town; that he forced the boy's mouth open with his fingers, and put his private parts into the boy's mouth, and emitted in his mouth.

''The question was whether this was sodomy.

''In Easter term, 1817, the judges met, and were of opinion that this did not constitute the offence of sodomy, and directed a pardon to be applied for.''

The above decision is referred to in Rex v. Redspear, [1832] 1 Mood. C. C. 342 and in Rex v. DeMunck, [1918] 1 K.B. 636.

Rex v. Jacobs clearly states the rule of decision under the common law of England as adopted in 1865 by the First Legis-

lative Assembly of the Territory of Montana. The Montana Legislature has enacted the rule of Rex Jacobs into the law of this state by express statute which provides that "it shall be the law and rule of decision" in this state. See section 8060, Rev. Codes Mont. of 1907, now R.C.M. 1947, section 12-104. Such "law and rule of decision" should have been known, observed and applied by the justices constituting this court when State v. Guerin was decided. Such "law and rule of decision" should be known, observed and applied by the justices presently constituting this court in deciding the instant appeal of Dietz.

In Prindle v. State, 31 Tex. Cr. R. 551, 21 S.W. 360, 361, 37 Am. St. Rep. 833, the court cited, relied upon and applied the rule of decision of Rex v. Jacobs, supra, and said: " 'Sodomy, which is the abominable and detestable crime against nature known to the common law is, by article 342 of the Penal Code made an offense' in this state; and being, undefined, we must look to the common law for the elements of this crime. [Citing case.] 'To constitute this offense, the act must be in that part where sodomy is usually committed. The act in a child's mouth does not constitute the offense.' 1 Russ. Crime, page 937; Rex v. Jacobs, Russ. & R. 331.''

In People v. Boyle, 116 Cal. 658, 48 Pac. 800, the Supreme Court of California cited, relied upon and applied the rule of decision of Prindle v. State, supra, which followed the rule declared by The Twelve Judges of England in Rex v. Jacobs, supra. The decision in the Boyle case, as reported in 48 Pac. at page 800 reads:

"PEOPLE V. BOYLE. (CR. 235.)
" (Supreme Court of California, May 6, 1897.)
"SODOMY — WHAT IS NOT
"The crime of sodomy is not committed where the act is in a child's mouth * * *
"Per Curiam. The defendant was convicted of a felony, technically designated in the information as an assault with intent to commit the infamous crime against nature. He ap-

peals from the judgment and order denying his motion for a new trial. The facts of the case do not make out the offense of which the defendant has been convicted: It has been so held in at least two cases. See Prindle v. State, 31 Tex. Cr. R. 551, 21 S.W. 360; 1 Whart. Cr. Law, section 575. Judgment and order reversed, and cause remanded.''

At no time have the courts of California departed from the rule of decision so applied in the Boyle case, supra.

In Smith Engineering Co. v. Rice, 102 F. (2d) 492, at page 497, the United States Circuit Court of Appeals, 9th Circuit, said:

''In 2 Rev. Codes Mont. 1921, section 5672 [now R.C.M. 1947, section 12-103], it is provided that 'The common law of England * * * is the rule of decision in all the courts of this state.' The 'common law of England' as used in the statute 'means that body of jurisprudence as applied and modified by the courts of this country up to the time it became a rule of decision in this commonwealth' and 'that time began with our first territorial Legislature.' Herrin v. Sutherland, 74 Mont. 587, 594, 241 Pac. 328, 330, 42 A.L.R. 937. * * *

''Under the above quoted statute, two questions are apparent: (1) What was the common law of England, as defined by Montana decisions, up to 1864, the date of the organization of Montana as a territory? (2) Is that law inconsistent or repugnant to the Montana codes?''

In determining the appeal in State v. Guerin, the Supreme Court of Montana was confronted with these same questions, viz.:

(1) What was the common law of England up to the date of the approval of the Act of our First Territorial Legislature in 1865, adopting the common law of England as ''the law and rule of decision'' in this jurisdiction?

(2) Is that law, as so adopted, by our First Territorial Legislature inconsistent or repugnant to the Montana Codes?

The answer to the first question is: Under the common law of England of force up to the date of its adoption by our First

Territorial Legislature in 1865, "the infamous crime against nature" also known as sodomy was only committed per anum and not otherwise. The Twelve Judges of England, in Rex v. Jacobs, supra, in 1817 A.D., so held.

The answer to the second question is: There is nothing in the ruling and decision in Rex v. Jacobs, inconsistent or repugnant to the Montana Codes.

Under the provisions of section 3552, Rev. Codes Mont. 1907, the decision of The Twelve Judges of England in Rex v. Jacobs "is the rule of decision in all the courts of this state." It is a part of the common law of England as adopted by California in 1850 and as adopted by Montana in 1865.

*1865 Cut-off Date.* In Montana the cut-off date of the common law of England, as here adopted, was January 11, 1865, the date of the approval of the adopting statute. See Laws of Montana Territory, 1st Session 1864 (Bannack Statutes).

*1850 Cut-off Date.* In California the cut-off date of the common law of England, as adopted in California, was April 13, 1850, being the date whereon the First Session of the California Legislature passed Chapter 95 at page 219, of the Statutes of California of 1850.

Notwithstanding these facts the three justices of this court who heard the appeal in Guerin's case declined to observe, accept or apply the ruling and judgment of Rex v. Jacobs, supra.

In rejecting Rex v. Jacobs, the three Montana justices based their opinion in the Guerin case, wholly upon Hawkins' above-quoted uncertain statement lifted from Chapter IV, Book I of his "Treatise" published in 1716, and upon the following five cases, viz.: State v. Start, 1913, 65 Or. 178, 132 Pac. 512, 46 L.R.A., N.S., 266; Honselman v. People, 1897, 168 Ill. 172, 48 N.E. 304; Kelly v. People, 1901, 192 Ill. 119, 61 N.E. 425, 85 Am. St. Rep. 323; Herring v. State, 1904, 119 Ga. 709, 46 S.E. 876, and State v. Whitmarsh, 1910, 26 S.D. 426, 128 N.W. 580.

The decision of Rex v. Jacobs is no part of the common law

of England, as adopted by the States of Oregon, Illinois and Georgia, because the adopting statute of each of these states fixed an earlier *cut-off date* for the common law of England than the year 1817 wherein Rex v. Jacobs was decided.

*1606 A. D. Cut-off Date.* In Illinois the adopting statute provided the common law of England, so far as the same is applicable, of a general nature and all statutes or acts of the British parliament made in aid thereof *prior to the fourth year* of James the First (which fourth year began on March 24, 1606) shall be the rule of decision until repealed by the Legislature. Ill. Rev. Statutes of 1874, at page 269.

Additionally in Honselman v. People, 1897, 168 Ill. 172, 48 N.E. 304, and in Kelly v. People, 1901, 192 Ill. 119, 61 N.E. 425, 85 Am. St. Rep. 323, on which this court so stoutly relied in deciding the Guerin case, the Illinois courts were not engaged in expanding, enlarging, stretching or otherwise amending or rewriting either the Illinois statutes or the common-law definition of *"the* infamous crime against nature." They were not concerned with the common-law crime. In the Honselman and Kelly cases, the Illinois courts were construing the statutes of Illinois which are differently worded and entirely dissimilar to the Montana statute, section 8359, Rev. Codes Mont. of 1907, now R.C.M. 1947, section 94-4118.

In the Honselman case, the Illinois court said: "The claim is that the evidence must prove the crime of sodomy, and that the crime against nature, as defined in our statute, embraces nothing but sodomy, or buggery, as denominated in the English statute. With this we cannot agree. While the 'crime against nature' and 'sodomy' have often been used as synonymous terms, *paragraph 279 of our Criminal Code, defining infamous crimes, plainly shows that the legislature included in the crime against nature other forms of the offense than sodomy or buggery*. It is there enacted: 'Every person convicted of the crime of * * * sodomy *or other crime* against nature * * * shall be deemed infamous', etc." Emphasis supplied. [168 Ill. 172, 48 N.E. 305.]

In the Kelly case the Illinois court said:

"Counsel says that, if the crime set out in the forty-seventh section of the Criminal Code is the common-law crime against nature, the evidence does not make out the offense. That is conceded, but *we have held that it is not the common-law crime*. Honselman v. People, supra." Emphasis supplied. [192 Ill. 119, 61 N.E. 426.]

The above Illinois cases have been clearly distinguished in Weaver v. Territory, 14 Ariz. 268, 127 Pac. 724; State v. Johnson, 44 Utah 18, 137 Pac. 632; Kinnan v. State, 86 Neb. 234, 125 N.W. 594, 27 L.R.A., N.S., 478, 21 Ann. Cas. 335. Compare Barton v. State, 79 Ga. App. 380, 53 S.E. (2d) 707.

*1776 A.D. Cut-off Date.* In Georgia, "The common and statute law of England, of force in this state on May 14, 1776, remains of force, so far as it is not incompatible with the Federal or the State Constitution or has not been modified by statute." Grimmett v. Barnwell, 184 Ga. 461, 192 S.E. 191, at page 194, 116 A.L.R. 257. Also see Hannah v. State, 212 Ga. 313, 92 S.E. (2d) 89.

In Herring v. State, 1904, 119 Ga. 709, 46 S.E. 876, at page 881, the supreme court of Georgia said: "In the motion for a new trial, the greatest effort on the part of counsel for the plaintiff in error was devoted to presenting his contention that *the offense of sodomy cannot be committed otherwise than per anum. We have no access to the English statutes on this subject, but that this was the construction of the common-law writers seems to be settled by the weight of authority.* See 3 Russ. Crim. (6th Ed.) 250; 1 Whart. Cr. Law (10th Ed.), section 579; Bac. Abr. tit. 'Sodomy'; Clark's Cr. Law (2d Ed.) 367, and cases cited. * * * Our Pen. Code 1895, section 382, defines this crime as follows: 'Sodomy is the carnal knowledge and connection against the order of nature, by man with man, or in the same unnatural manner with woman.' * * * Pen. Code 1895, section 384 * * * reads as follows: 'Bestiality is the carnal knowledge and con-

nection against the order of nature, by man or woman in any manner with a beast'." Emphasis supplied.

*1775 A.D. Cut-off Date.* In Oregon the cut-off date of the adopted common law of England was fixed at the time of the beginning of the American Revolution which would be about the year 1775 A.D.

In Peery v. Fletcher, 1919, 93 Or. 43, 182 Pac. 143, at pages 146, 147, it is said: "What may be the common law in one state is not necessarily so considered in another * * * In some of the states all statutes and acts of the British parliament which were passed prior to the fourth year of James the First are declared to be a part of the law of the state. 6 Am. Eng. Enc. of Law (2d Ed.) page 278. * * * In applying the general rule to a state which, like ours, had no political existence before the Revolution, it must be in harmony with reason be held that, when our territorial Legislature and the framers of our Constitution and our courts recognized the existence here of the common law, they must have had reference to that law as it existed modified, and amended by the English statutes passed prior to the Revolution. * * * It is not necessary in the case at bar to fix the exact age of the English statutes which were ingrafted into the common law and recognized as a part of the law of this state." Compare State ex rel. Metcalf v. District Court of Fourth Judicial Dist. in and for Ravalli County, 52 Mont. 46, at pages 50 and 51, 155 Pac. 278, at page 279, L.R.A. 1916F, 132.

In United States Fidelity & Guaranty Co. v. Bramwell, 108 Or. 261, 217 Pac. 332, 333, 32 A.L.R. 829, it is said: "The common law of England, modified and amended by English statutes, as it existed at the time of the American Revolution * * * has been adopted and is in force in this state."

In State v. Whitmarsh, 26 S.D. 426, 128 N.W. 580, at pages 581, 582, the Supreme Court of South Dakota said: "The question presented is, whether or not the crime against nature when committed by one male person upon another male person can be committed through the mouth, or whether it can only

be committed through the anus. *It must be conceded that under the common law sodomy could not be committed by means of the mouth;* the reason given by all the authorities being that given in Russell on Crimes 937: *'To constitute this offense, the act must be in that part where sodomy is usually committed.'* * * * Texas, California, and Nebraska *have held that their statutes include simply those acts that were sodomy under the common law.* The Texas court enters into no discussion of the question, but merely bases its decision upon Russell on Crimes and the case of Rex v. Jacobs, Russ. & R.C.C. 331, saying that, the offense 'being undefined, we must look to the common law for the elements of this crime.' Prindle v. State, 31 Tex. Cr. R. 551, 21 S.W. 360, 37 Am. St. Rep. 833. * * * In the case of People v. Boyle, 116 Cal. 658, 48 Pac. 800, the California court followed the above Texas decision without any discussion whatsoever simply saying: 'It has been so held in at least two cases'—and citing the Texas case and 1 Wharton Cr. Law, section 575.''

Irrespective of the law or practice that may or may not obtain in South Dakota, Illinois, Georgia or Oregon the justices and judges in this jurisdiction are expected to "know the law of the realm" and then to "duly observe it." Vol. 1, R.C.M. 1947, page 6, section 45.

By "the law of the realm" our justices and judges are denied the authority or power to legislate, or to amend or change the provisions of the statute or Constitution (Vol. 1, R.C.M. 1947, page 129 Art. IV, section 1, Mont. Const.) and, in construing same they are denied the authority to *"insert what has been omitted, or to omit what has been inserted"* (Vol. 7, R.C.M. 1947, page 764, section 93-401-15). Thus under the law of the realm it is mandatory that our justices and judges interpret the provisions of R.C.M. 1947, section 12-103 and section 94-4118, as they were written and enacted by our Legislature and in the construction and application of section 94-4118 to "include simply those acts that were sodomy under the common law of England" as of the year

1865 when adopted by the Territory of Montana. Such apparently was not the law in South Dakota at the time of the Whitmarsh decision.

The California court well knew that the civil law obtained in California prior to April 13, 1850, on which date California adopted the common law of England as it was prior to such adoption date. California's adoption of the common law of England carried with it and included the then recent decision of The Twelve Judges of England in Rex v. Jacobs, decided but thirty-three years before California's adoption date and cited, relied upon and applied by the Texas court in Prindle v. State, supra.

In Barton v. State, supra [79 Ga. App. 380, 53 S.E. (2d) 708], the Court of Appeals of Georgia, further said:

"We should have been inclined, without question, to think that the indictment, being in the terms of the Code, was sufficient but for the decision in Herring v. State, 119 Ga. 709, 46 S.E. 876 * * * The Herring case, supra, holds that the crime of sodomy may be committed otherwise than per anum. *At common law the crime of sodomy could be committed only per anum by man with man or by man with woman.* If the common law were still of force in this State, the indictment in the instant case would have been so plain *(by its terms capable of meaning only one act, carnal knowledge and connection against the order of nature; namely, per anum)* as to have been clearly understood by the jury as required by Code, section 27-701. * * * Under the status of the law as it has apparently existed since the decision in the Herring case, supra [119 Ga. 709, 46 S.E. 881], the crime of sodomy may be committed in a variety of ways, including 'all unnatural carnal copulations.' If under our statute, sodomy includes 'all unnatural carnal copulations' we are faced with an apparent conflict between the Herring case, a decision rendered by five justices, Simmons, C. J., being absent, and the decision in Thompson v. Aldredge, 187 Ga. 467, 200 S.E. 799, wherein an unnatural copulation between two women was held to be

not sodomy, a decision by the full court. If the decision in the Herring case is the correct one, then sodomy may be committed in more than one way and the indictment would not be sufficient to withstand a proper demurrer in the nature of a motion to quash, for, under the repeated rulings of both the Supreme Court and this court Code, section 27-701, providing that indictments in the terms of the code are sufficient, was not intended to dispense with good pleading, or to deny to one accused of an offense, which may be committed in more than one way, a statement of the facts relied upon to establish his guilt, sufficiently full and complete to put him upon reasonable notice of what he is called upon to meet. [Citing cases.]

"Since the decision in the Herring case is binding upon us upon the principle enunciated there, we have no recourse but to bow to its authority, and, consequently, to determine whether the indictment should have been quashed on demurrer. However, since the court in the Thompson case refused to take a view of the crime as including 'all unnatural carnal copulations' even where the practice involved the odius and unnatural copulation per lengua in vagina between two women, we shall examine rather more closely than we would have otherwise done the necessary elements of the crime. It can hardly be necessary for us to say that the subject is distasteful. The question involved, however, is one of law and cannot be brushed aside or lightly disposed of. An adequate consideration of it seems to require a somewhat full discussion and we shall endeavor to meet this requirement without unnecessary indelicacy of expression, but also without prudery or idle denunciation of the crime. This character of conduct is, of course, a vice of depraved natures and instances of its coming before the courts of this State are fortunately rare. Courts are not, however, called upon to expound upon the esthetics or lack of esthetics of a crime in determining the law involved, and however much they may look upon the crime with disgust, their abhorrence of the crime is not to be allowed to blind them to a correct application of the principles of law involved. * * *

"* * * The Greeks denominated the crime pederasty, connoting coition per anum, or literally, love of boys, through the frequent use of the word pais, meaning either boy or girl, would seem to indicate that the crime was likewise committed upon girls. The Romans forbade the crime spoken of as venus postica (see Petronius' Satyricon) (hence the archaic English word, 'venery,' meaning sexual excesses) which strongly hints that the crime prohibited was perpetrated per anum, if indeed it does not mean exactly that! * * *

"It would seem that the Supreme Court of Georgia *in its interpretation of our statute* has expanded the common law definition of sodomy in the Herring case and reaffirmed its action in the White case where this court certified the question of whether or not the crime of sodomy may be committed otherwise than per anum." Emphasis supplied.

Thus some forty-five years after the pronouncement of the decision in Herring v. State, supra, did the Circuit Court of Appeals of Georgia, in Barton v. State, supra, decided in 1949, recognize the unsoundness of the decision in the Herring case and appreciate both the embarrassment and danger that had resulted from such incorrect pronouncement.

Unless the five-word phrase, "*the* infamous crime against nature" when committed by man with mankind, refers to and means coitus committed per anum and not otherwise then, under the provisions of R.C.M. 1947, section 94-4118, supra, it would be "impossible for a citizen upon reading the text of it to determine when he is subject to its penalties." State v. Holland, 37 Mont. 393, at page 404, 96 Pac. 719, at page 722. Also see: State v. Lutey Bros., 55 Mont. 545, at page 553, 179 Pac. 457, at page 458; H. Earl Clack Co. v. Public Service Commission, 94 Mont. 488, at pages 502, 503, 22 Pac. (2d) 1056, at pages 1059, 1060, and Barton v. State (Ga.), supra.

*The Law of the Realm.* The law of the realm (Vol. 1, R.C.M. 1947, page 6, section 45) prescribing the duties and limitations of the justices of this court and prescribing "the rule of decision in all the courts of this state" (Vol. 2, R.C.M. 1947, pages

1 and 2, section 12-103) for deciding the single question of law presented on the appeal in State v. Guerin, supra, is clear.

The question was:

Under the common law of England of force in 1865 when adopted by Montana, can the infamous crime against nature, committed with mankind be perpetrated *per os?*

The answer is "No."

The Twelve Judges of England, in the performance of their official and sworn duty in the appeal of Rex v. Jacobs, then pending before them, in 1817, ruled and adjudged that under the common law of England, penetration *per os* does not constitute sodomy, otherwise known as *the* infamous crime against nature.

Such was the common law of England of force in England in 1865 when, by an Act of the First Territorial Legislative Assembly, it was adopted as the rule of decision in all courts of this state.

The court's official judgment in Rex v. Jacobs set aside and nullified anything repugnant to or inconsistent therewith published by William Hawkins a century before (1716 A.D.) in his literary composition entitled "A Treatise of the Pleas of the Crown." Thus is allayed the groundless fear expressed by the three justices of this court in the Guerin case, 51 Mont. at page 253, 152 Pac. at page 748, that the decision in Rex v. Jacobs would be "in direct conflict" with "the rule" stated by Hawkins in Chapter IV, Book I of his Treatise.

As between the carefully considered judgment rendered by The Twelve Judges of England, and the private writing expressing the personal observations and views of William Hawkins, the official judgment of the court must and does prevail. In other words, in William Hawkins (1716) against The Twelve Judges of England (1817) the latter win. We must indulge the presumptions that these judges of England knew the law of the realm; that in rendering their judgment they duly observed, declared and applied it and that they arrived at the right answer and the correct result.

The rule and decision in Rex v. Jacobs, a part of the common law of England when that law was adopted by the First Legislative Assembly of the Territory of Montana, became and continues to be "the rule of decision in all the courts of this state." R.C.M. 1947, section 12-103.

In Montana the legislative authority is vested in the Legislative Assembly and no judge or justice and no collection of judges or justices shall exercise any powers properly belonging to the Legislature. Mont. Const., Art. IV, section 1.

In the construction of the provisions of sections 3552 and 8359, Rev. Codes Mont. of 1907, now R.C.M. 1947, sections 12-103 and 94-4118, the law says "the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." R.C.M. 1947, section 93-401-15 and also see section 93-401-16.

The "rule of decision" to be resorted to and applied under R.C.M. 1947, section 12-103 is the rule of the common law of England as declared and adjudged in Rex v. Jacobs, supra, and not the construction and interpretation placed by the courts of the states of Oregon, Illinois, Georgia or South Dakota upon entirely dissimilar statutes construed in: State v. Start (Or.); Honselman v. People (Ill.); Kelly v. People, (Ill.); State v. Whitmarsh (S.D.), and Herring v. State (Ga.).

The order, ruling and judgment by District Judge J. M. Clements in the trial court in State v. Guerin, based upon Rex v. Jacobs, supra; Prindle v. State, supra; People v. Boyle, supra; State v. Johnson, supra; Kinnan v. State, supra; Commonwealth v. Poindexter, supra; Weaver v. Territory, supra; and Kontz v. People, supra, were correct.

Upon the reversal by this court of the trial court's order and judgment in State v. Guerin, supra, that cause was remanded for further proceedings and tried to a jury of twelve men, who returned a verdict acquitting the defendant Guerin of the charge so made against him. Thus did Attorney Rankin and his client win in the last and final round of State v. Guerin.

. This court's decision in Guerin' case, reversing Judge Clements' judgment therein is obviously unsound, misleading and inaccurate. It does not correctly state either the common law of .England or the statutory law of Montana. Notwithstanding, it became, was and is the source of the trial court's incorrect misleading and prejudicial Instructions Nos. 3 and 4, given at the trial in the instant case of State v. Dietz.

·. In · 1817. The Twelve Judges of England decided Rex v. Jacobs, supra.

In 1881 three justices of the Supreme Court of California decided People v. Williams, supra.

.· In 1897 seven justices of the Supreme Court of California decided People v. Boyle, supra.

In 1914, one district judge, J. M. Clements, decided State v. Guerin, supra.

In 1915 three justices of the Supreme Court of Montana reversed Judge Clements' holding in State v. Guerin, supra.

In 1916 twelve jurors by their verdict acquitted Guerin.

"Every person of ordinary intelligence understands what the crime against nature with a human being is." People v. Williams, supra.

Precisely who failed this test?

Was it:

The Twelve Judges of England in 1817;

The seven justices of California in 1897;

The trial judge J. M. Clements in .1914;

The Twelve laymen jurors rendering their verdict in 1916?

OR

Was it the three justices comprising this court in 1915?

The unsound, incorrect and dangerous opinion and decision in State v. Guerin, supra, should be overruled forthwith.

That the act, conduct and behavior of which the defendant Dietz was accused, in the instant case, does not constitute the infamous crime against nature does not mean that such alleged conduct and behavior is not punishable under present laws of Montana.

R.C.M. 1947, section 94-4106, reads:

"*Lewd and lascivious acts upon children.* Any person over the age of eighteen (18) years, who shall wilfully and lewdly commit any lewd or lascivious act, other than the acts constituting other crimes provided in sections 94-4101 to 94-4108, upon or with the body or any part or member thereof, of a child under the age of sixteen (16) years, with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of such person, or of such child, shall be guilty of a felony, and shall be imprisoned in the state prison not exceeding five (5) years." Compare R.C.M. 1947, section 10-511.

The defendant Dietz was not accused of, nor was he prosecuted for violating the provisions of section 94-4106, of the Revised Codes of Montana of 1947. He was accused and prosecuted for the alleged violation of the provisions of section 94-4118, as the crime there punishable was known to and defined and limited by the common law of England as it existed and was of force when adopted by The First Session of our Territorial Legislature.

Vol. 1, Oregon Revised Statutes, Chapter 167, section 167.040, at pages 1073, 1074, provides:

"(1) Any person who commits sodomy or the crime against nature, or any act or practice of sexual perversity, either with mankind or beast, or sustains osculatory relations with the private parts of any person, or permits such relations to be sustained with his private parts, shall be punished upon conviction by imprisonment in the penitentiary for not more than 15 years.

"(2) Proof of actual penetration into the body is sufficient to sustain an indictment for the crime against nature."

· Compare the wording of the above Oregon statute with that of sections 94-4118 and 94-4119, Revised Codes of Montana of 1947.

*Stare decisis.* In the revised majority opinion in the instant Dietz case, the doctrine of stare decisis is invoked.

In State ex rel. Morgan v. State Board of Examiners, 131

Mont. 188, 194, 309 Pac. (2d) 336, 340, decided February 25, 1957, in overruling Bryant v. Board of Examiners, No. 9700, 130 Mont. 512, 305 Pac. (2d) 340, decided less than three months before MR. JUSTICE ANGSTMAN speaking for this court said:

"We are not unmindful of the doctrine of *stare decisis*. However as this court has said the rule is not inflexible and 'previous decisions should not be followed to the extent that error may be perpetuated.' Quoting from 21 C.J.S. Courts section 193, pages 322, 323; State ex rel. Burns v. Lacklen, 129 Mont. 243, 284 Pac. (2d) 998."

In State ex rel. James v. Aronson, 132 Mont. 120, 140, 141, 314 Pac. (2d) 849, 860, decided August 20, 1957, in overruling State ex rel. Mitchell v. Holmes, 128 Mont. 275, 274 Pac. (2d) 611, Mr. Justice Castles speaking for this court said:

"The respondents urge that the rule of stare decisis should be applied in order to uphold the decision of this court in State ex rel. Mitchell v. Holmes. The rule of stare decisis is not so imperative or inflexible as to preclude a re-examination of that case. One reason to blindly follow an erroneous decision is when property rights may be affected by its change. Even then, this court has reversed decisions making the new decision applicable only to the future. Montana Horse Products Co. v. Great Northern Ry. Co., 91 Mont. 194, 7 Pac. (2d) 919; Continental Supply Co. v. Abell, 95 Mont. 148, 24 Pac. (2d) 133, and other Montana cases.

"No such reasons appear here. Therefore, we expressly overrule all that is said in State ex rel. Mitchell v. Holmes contrary to that said here."

In State ex rel. Tripp v. District Court of Fourth Judicial District in and for Missoula County, 130 Mont. 574, at page 610, 305 Pac. (2d) 1101, Mr. Justice Bottomly, quoting from William Cowper, wrote:

"The slaves of custom and establish'd mode,

"With packhorse constancy we keep the road,

"Crooked or straight, through quags or thorny dells,

"True to the jingling of our leader's bells.
"To follow foolish precedents, and wink
"With both our eyes, is easier than to think."

MR. JUSTICE BOTTOMLY:

I agree with MR. JUSTICE ADAIR'S foregoing historically correct, legally sound, exhaustive dissent.